Motion for the admission of one of my law clerks to our Federal Circuit Bar. So for this purpose, I will be making the motion and therefore refuse myself from the panel which will decide whether to grant the motion or not. So James, please stand up. I move the admission of James Michael Lyons, who is a member of the Bar and is in good standing with the highest court of New York. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. So James has been my clerk for 19 to 20 months now. On multiple occasions, his clerkship has gotten extended and he's been very gracious and willing to do that. He has been a wonderful asset to the chambers. He's very calm, keeps everything calm, which I believe is wonderful, but he brings just a wealth of knowledge before me. He clerks on the district court and with great distinction. He worked for several years as a lawyer and in the time he's been with me, he has written a number of really fabulous opinions. Helped me write really fabulous opinions. And I've really, more than anything, just enjoyed getting to know him. And I have learned more about the state of Maine than I ever thought I would. And I sometimes refer to him as a maniac and he is constantly correcting me that that's not what people from Maine call themselves. But it has been my great privilege to have him as my law clerk and I know that he will be an upstanding and valuable member of our Bar, so I make the motion for his admission. As well, if you're presiding for that purpose. Well, I'll take a witness on fourth year. You say lobster and chowder? No, your honor. Well, okay. Stan, do you have any questions? Mr. Lyons served his time. He earned the right to be a member of our Bar. However you want to take it, then the motion's granted. Wonderful. Please turn and our courtroom deputy will swear you in. I swear to you by the authority vested in me, that I will not torture you for the rest of my life. I swear to you by the authority vested in me, that I will not torture you for the rest of my life. I do. Yay! Well, now let's do some additional business. Our only case on the docket this morning is 2019-1147 BTG International Limited versus Amiel Pharmaceuticals. Mr. Teller, please proceed. Thank you, your honor. I may please the court. The treatment method claimed in the 438 patent revolutionized the treatment of advanced prostate cancer. Mr. Teller, you're not going to like my first question, but you'll answer it for me. This appeal consolidates the PTAB in the district court. If we affirm the PTAB's claim construction, that renders the rest of the appeal moot, right? No, I don't think it does, your honor, for a couple of reasons. The first is, as we suggested in our reply brief when the appellees raised the mootness question, Janssen may have a cause of action for basically the period of statutory exclusivity that it lost prematurely if we're right about what 315-E2 means. That hasn't been explored. We would submit that that should be explored on remand. Beyond that, though, I think if you put that aside, if you affirm the PTAB, I think you could avoid, you could choose to avoid the 315-E2 issue, but you wouldn't be required to. I think you would have the power to decide it. It's not moot in any sort of a jurisdiction. Why the heck would we want to decide that question if it's not necessary to the resolution of the case? It is a large issue of statutory interpretation. Why would, I mean, it seems like doctrines like, say, constitutional avoidance ring in my ears when I think about something like this and think if there is a very narrow way to decide this case, why should we decide it, go the extra step, unnecessarily, unrequired, and decide a really bigger important issue? Well, it is precisely because it is a big important issue, Your Honor, that I think you should decide it. This court, as do other appellate courts, it's not at all unusual for the court to say, well, although we technically don't have to reach this issue having decided this other issue, this is an issue on which lower courts and litigants need guidance. And that is particularly true. Why? How many, I have never seen a case other than this one which has raised this issue or in which it has been a problem. So do you have any evidence to suggest to me that this is a pervasive issue that is arising in a number of cases? I didn't see it in your briefing. Well, we did point out in our briefs that another district court and an ITC ALJ have read the statute our way. That would suggest that it's really not an issue, because that would suggest that there's one aberrational court that may have read it incorrectly, in your view, but that incorrect decision is entirely mooted by the PTO action. So why should I reach out and decide that issue when all of the other courts who have addressed it have actually agreed with you? Well, clearly all the other courts haven't because the district court here didn't. All the other courts. I misunderstood. And also, I think that you have an amicus. You have actually, you have amici on both sides of the issue. I think pointing out that there is a legitimate dispute here about it. We have the amicus who filed on behalf of the appellees basically saying that this is going to bring the Hatch-Waxman Act to its knees if you don't clarify exactly what this statute means. On the other hand, we have the PTO of basically saying you should apply this, as we do, saying you should apply the statute as written. So there is a, it's an, as your Honor said, it's an important issue, squarely presented here. It's not, it's not moved as, as, you know, the Supreme Court decisions like Already v. Nike and Cardinal Chemical make clear. But I guess I still am not seeing the evidence. I hear your rhetoric, but I'm not seeing the evidence that this is an important issue beyond the fact that it's just an interesting question of statutory interpretation. And what I mean by important is the impact this issue is having on existing litigation. I don't personally see evidence that there are lots of courts struggling with it or making the wrong decision or there's one court that potentially made the wrong decision in your view and that entire decision would be mooted. We could even vacate it by virtue of it being mooted in this case. So I, I am not sure that anything you've said to me justifies the need to add clarity to the law and that there are really a lot of people impacted by this. Well, your Honor, I can't, I can't point you to dozens of cases coming out the other, the other way. What I can tell you is obviously one court did in this case. Also, if you look at, and it was not in the briefs before this court, although it is in the district court briefing, there are, I think it's fair to say, dozens of district court opinions where the issue isn't squarely presented because that you didn't have the precise lineup of the parties that we have here, but the courts describe the statute in ways that really cut both ways. Some describe it in terms that it's an estoppel that applies broadly. Others... But in none of those cases is the issue present. So why in the world would this panel not wait till a case where it actually matters? Well, you, as I said, you could avoid the question. The problem, I think, is if you wait, in the meantime, there, the uncertainty persists and you have district courts in case, pardon me, in cases where there's an IPR proceeding either going on or where a final written decision has issued, not knowing what is the proper way to handle infringement allegations. And so you have, basically, the danger of multiple litigation of the invalidity issues when that's exactly what, under our view, Congress meant to prevent in 315E2. When the Patent Board issued three different IPR decisions in January of 2018 finding all of the claims of this patent unpatentable, why didn't the district court just stop any further work on the district court action? Why didn't the district court just stay the state of the district court action right then and there? Well, we filed a motion in the district court saying you shouldn't consider invalidity anymore because of 315E2 and the issuance of the final written decisions. There was still the infringement issue. Right, but my larger point is why keep going with any aspect of the district court litigation given that there were now three different decisions, finding three different rationales for finding all of the claims unpatentable? What was... Why keep going? Why go ahead and have a full trial? Well, certainly, obviously, as I said, we didn't think invalidity should be tried at that point. I don't think anybody asked the court to suspend proceedings on the infringement part of the case pending, I assume what Your Honor's point is, wait until the appeals from the final written decisions ran their course and then just enter judgment one way or the other. No, we're just wondering why you didn't move or stay in the district court of all of this. Well... That seems like the most logical way to have proceeded. Well, it's... Especially given what you say is necessary to avoid, which is duplicative litigation between the PTO and the district court. Well, and had invalidity been the only issue, it would have been a different situation, but we still had to prove infringement and obviously we... Our intention, as I'm standing here today, proves was to challenge the PTO determinations, the PTAB determinations on invalidity, and had... If we succeed on that and infringement hadn't been tried, then you go back for a trial and meanwhile the 30 months... Obviated, you could have obviated all of the parade of horribles you're suggesting to me could possibly exist by simply moving to stay in the district court. Well... And, you know, that's so... So if you want us to go out of our way to decide an issue of stationary interpretation, which no other court but this one has, in your view, decided wrongly and all the other courts are deciding it correctly, you nonetheless want this court to tackle it, challenge it, go through it, and adjudicate it and resolve it. Even though it's unnecessary in this case, and you're saying because it could cause duplicative litigation a problem in the future, but I think that we've just shown multiple ways in which that could be avoided by the parties. And so I'm not certain that you have by any means justified why this court should reach out to decide an issue that's unnecessary in a case. Well, your honor, the duplicative litigation part of it was considering invalidity. The infringement part was not duplicative. The only place that could be heard was in the district court. Now, certainly, if the court had stayed the case, and obviously... Yes, but your client shouldn't want to be paying for lawyer services to resolve infringement of a patent for which multiple IPRs have been granted across all of the claims. Why is it in your client's best interest to proceed even with the infringement portion, given that the PTO could well invalidate, granted that they accepted IPR, on multiple IPRs challenging all of the claims, that the chances are, at the end of the day, they're going to invalidate it. Why would anybody but the lawyers for your client make out by your client not staying this case? Well, your honor, I can assure you that the lawyers didn't drive any decisions. It was clearly the client's decision. Well, your clients are not always clients. Well, my clients are, but that's a separate topic. Your honor, the... It's your job to rein them in. Well, as anybody who's been in private practice knows that it's not... Let me take you somewhere else for a moment, if I may, Mr. Tulloch. Is Claim 1 of the 438 patent representative? I believe it is, your honor, yes. Okay. You cite, in a section titled Definitions of the Patent Explained, you're at 30, if you're liberate. As used herein, unless otherwise defined, the terms treating and treatment include the eradication, removal, modification, management, or control of a tumor, primary, regional, or metastatic cancer cells or tissue. Yes. Can't management reasonably be interpreted as keeping the patient in shape to continue treatment? I don't think so, your honor. Why? Well, because it says, it doesn't say management, obviously doesn't say management of the patient. It also doesn't say management of the cancer. It says management of the tumor, the cancer cells, and the tissues, and I think that... If you're doing a broad interpretation of what reasonably can be interpreted of management, why doesn't that include keeping the person in a condition such that you can do those other things to the tumor? Well, which of course brings in everything else. Exactly. For several reasons, your honor. One is, as I said, I think the focus on tissue tumors, cells, I think argues against it. It may not preclude it, but I think it argues against it. The other point is that the entire patent, there's not any mention at all of side effects of pain, palliation, anything like that. It's all focused strictly on treating the cancer. The definition of therapeutically effective amount, when the patent talks about how much of each of the different agents should be administered, it's an amount effective to treat the cancer. So I think in the context of this patent, even the controlled or management language there, I think it is focused on treatment of the cancer itself, meaning the cells, tissue, tumors. This definition defines the second agent to be combined with the CYP inhibitor as being either an anti-cancer agent or a steroid. Correct. So that suggests that steroids is not necessarily the same thing as an anti-cancer agent. Well, I think I have a couple of responses. One is the amount of the steroid that is to be given is an amount that is effective to treat the cancer. So even if... Does that include management? Well, that circles back, it obviously circles back to what what treating means, but I think I think Judge Ten's question may be a little bit broader than that. It's an oral question, yes. Right, right. And it says, you know, amount effective to treat the cancer. So it's focused, even though steroids, obviously steroids, can have all sorts of other effects, none of them are mentioned here, and what it's talking about is the use of the steroid to treat the cancer, putting to one side what treat means in this in this context. So you want me to read anti-cancer effect or anti-cancer agent or steroid as being translated to anti-cancer agent or another kind of anti-cancer agent called a steroid? Well, I think in the... particularly in the context, sure, where we're talking about prednisone, and prednisone is included as an anti-cancer agent. Because it's an anti... anti-cancer agents include antibiotics. Antibiotics are defined to include prednisone. So I think in the context of this specification and these claims, in fact, it does... it does mean anti-cancer agent, a CYP-17 inhibitor, plus another anti-cancer agent, in this case prednisone. The... and... and I think... Well, then why does the specification say anti-cancer agent or steroid? That's what I don't understand from this, and it can't reasonably be read that way. Well, I don't... I think the... the explanation for why the specification is as it is, is the specification is quite a bit broader than the claims. The specification, as your Honor noted, talks about steroids. I don't know, the claim is pretty broad. Well, the... well... well... Treat cancer using element one, element two. Right. Period. Well, except that it's... it's saying exactly what element one and element two are. Whereas the specification, obviously, is talking about all sorts of different agents, some of which may have anti-cancer effects alone, some of which may only have them... as prednisone does when used in combination. Well, timeout. I'm not sure that I understand that to be the record in this case. And the one thing that was bothering me is that your briefing fails to entirely address the Lockhart IPR and the separate finding, which I'll say spans pages 349 to 351 of the brief, of the appendix, wherein the PTO makes an express finding that SARTOR establishes that prednisone alone was being used effectively in some kinds of patients to treat prostate cancer. Even under your construction of the claim, that is an independent fact-finding in that IPR, which invalidates all the claims, and I can't see that you addressed it anywhere in your briefing. Well, I think we did, your Honor, and... and we did it in a couple of ways. First of all... Where? Why don't you tell me where in your briefing you addressed that separate fact-finding that is an independent basis for claim construction? If you want to do it on rebuttal, you can. Well, I... yeah, let me do that. I'm going to restore rebuttal time. It's a complicated case. It is, but I'll find you the exact pages, and I'll give you that on rebuttal, but if I could take a minute now, I think I can address what I... what I believe we said in the brief, which is a couple of things. One is nobody... the board didn't suggest, and FLEs don't suggest, that the board applied that, let's call it the alternate claim construction, when it addressed objective indicia, and it clearly did not. Focus solely on abiraterone alone as the anti-cancer element of the invention. There's no suggestion anywhere in this discussion of objective indicia that it was applying what's... let's call it the Wachhardt or the alternative claim construction. The other thing is that even as to the... what the board said about SARTOR and supposed anti-cancer effects of prednisone, and there are... there are problems with that, but I won't go into those right now, the board never found that there was a reasonable expectation of success in proving... in providing a cancer treatment in which prednisone, in the combination, has an anti-cancer effect. And in fact, it could not have made that finding because... How the claim construction affected the board's, or infected, in your view, the board's analysis of the objective considerations. There was some commercial success evidence. There was this unexpected or long-felt need. Tell me how... show me in the board opinion how you believe that the wrong-headed claim construction led them to the wrong conclusion about this objective indicia. Sure, let me take, just as an example, the board's discussion of unmet need... Tell me what page, in the board's opinion, please. Well, let's look at... and there... I think they're all the same on this... Appendix 366. That's in Wachhardt. And... and what... so what the board says is... Here, again, it's focusing solely on abiraterone, saying there was no unmet need because abiraterone had been available and underutilized for a decade. And so that showed that there was no unmet need for an abiraterone-based therapy. But the problem is the therapy is not... it's not limited to abiraterone. It's abiraterone plus prednisone with both... Well, but you can say that, but that's in... you directed me to page 366, and I'm looking at the section on long-felt need, and in every single sentence the board says administering abiraterone, acetate, and prednisone. So I don't understand how their analysis could be read the way you just articulated it in court when they are careful to link the two together in their discussion. Well, because I think if you look at the analysis, what they're saying is abiraterone was underutilized, and that shows that there was no unmet need. But that's not the relevant inquiry, because the long-felt need was not for a treatment based on abiraterone. It was for a treatment that was effective, and it was only because of the combination and the anti-cancer effect of prednisone that that need was met by this claimed invention. The other... another example, Your Honor, is commercial success. There, the board completely discounted any anti-cancer effect of prednisone, and essentially said commercial success was driven by abiraterone. Abiraterone was in the prior art. Therefore, there was... the commercial success was not attributable. No, no, no, the thing is, you're saying these things out loud in court, but I'm looking on page 367. Both abiraterone and prednisone were well known in the prior art, as was administering prednisone with other anti-cancer agents, including inhibitors and other things. It seems to me, and then it talks about I mean, I don't know, I... are driven by the benefits of adding prednisone to the treatment of abiraterone acetate. Is that... I mean, is that the sentence that you think supports the flaw? What are the... I am just struggling to see how your vision of the claim construction rendered the fact findings on objective considerations infected and wrong. I don't... I believe it's certainly possible that could happen, but in the opinion itself, the board seems to link them together. So what... if you could help me by pointing me to the board's opinion, this is exactly where they went wrong. Not like in the abstract, we think they went wrong. Well, this is where they went wrong. Okay, Judge Moore, let me... the section you were just looking at, let's look at appendix pages 369 to 370, and where the... where the... what the board is saying there... It's talking about, at the bottom of 369, it's talking about the supposedly the purpose of administering prednisone to deal with side effects, and then it says this at the bottom, this literature's discussion acknowledges the previously known roles of abiraterone, essay, and prednisone, and the discussion of the court of quarters are generally contradicts the specific anti-cancer role of prednisone argued by Pat Nohr. Well, that's the claim construction issue right there, and that's it right at the heart of the court's... I'm sorry, the board's analysis of commercial success. So that's the problem. That's an example of the problem, Your Honor, where I think the claim construction... I can... I'm sorry, please go ahead. Your label for your product doesn't say anything about prednisone. Serving as an anti-cancer agent, or killing cancer cells. It only talks... There's some place in the label that talks about how it's used to handle the side effects of taking the abiraterone. In the... well, the indications and usage part of the label, which is the important part, I mean, for these purposes, talks about the kind of... Is there anything anywhere in the label that says the prednisone itself is killing cancer cells? No, I don't think there's anything in the label that says that prednisone itself is killing... But there is something in the label somewhere that says that prednisone is quite handy, because you can deal with reducing the side effects from taking the abiraterone. I think that's right, but what the FDA approved in the indications and usage is the use of the combination to treat metastatic castration-resistant prostate cancer. And it is the combination that was evaluated and the combination that was approved for its anti-cancer effects. As the district court found in the infringement part of the decision, the label precisely tracks the claim language. So, can I take you back to trying to understand what an anti-cancer agent is? Sure. In the spec, it says, in column 4, the term anti-cancer agent is any therapeutic agent that directly or indirectly kills cancer cells, or directly or indirectly prohibits, stops, or reduces the proliferation of cancer cells. Yes. So, I think I understand what directly means, but could you elaborate on what it means to indirectly kill cancer cells, or indirectly prohibits, stops, or reduces the proliferation of cancer cells? Sure. I could imagine one theory of indirectly being, there's a main event drug, maybe it's abiraterone, that does all the direct killing, but it's not tolerable on its own for a patient. And so, now you need something else to handle all the side effects that comes with the main event drug. And that could be something like a glucocorticoid that compensates for a loss of hormone that comes with taking the inhibitor. So, why wouldn't that be understood as perhaps indirectly assisting in the treatment of cancer and killing or prohibiting the promotion of further cancer cells? Well, for a couple of reasons, Your Honor. One is, I think, there's not a broadest reasonable interpretation. There's nothing in the specification that makes any reference to any of those side effects, or pain relief, or anything like that. So, there's no suggestion that that is included in the notion of... But I don't see anything in the spec, which is not that long in terms of going through the science, right? Explaining what does it mean to be indirectly dealing with cancer. I think I... There's nothing in the spec unless you read treatment in a way different than you read it. Well, you have to read it differently than I read it, and you have to add a lot, I suggest. But, Judge Chen, to your question, and I will say that I don't think that there's expert testimony in the record on this, but I'll tell you what I think directly and indirectly mean here. Directly, I think, means what's called a cytotoxic effect. It actually, it's a poison for those cells, which is much like chemotherapy. That's the way chemotherapy works. Indirect, I think, means, as in this invention, cutting off the supply of hormones that those cells need to survive. I think that would be an indirect effect on the cancer cells or tissue. The direct effect would be you directly poison them with a, for example, a chemotype agent. I think that's the... That's what that means in that context. Okay, thank you, Mr. Trello. Let's hear from the collection of people on the other side. Mr. Krause, are you going first? Oh, you're sitting over here. May it please the Court? The USPTO is here at the Court's invitation to address the questions related to the... I have a logistical question first. The Board issued all three IPR final written decisions in January of 2018. The patent owner filed a free hearing request in February of 2018. For some strange reason that I don't understand, and there's no earthly justification I can think of a good reason, the Board lolligagged and took 10 full months before it issued its free hearing decision in December of 2018. Why in the world did it take so long for the Board to issue its free hearing decision? In fact, it only seemed to happen after our order may have, my guess, prompted those decisions. I honestly don't know the answer to either of those questions. The Board aspires to answer free hearing requests. I mean, don't you think it's a little embarrassing? I mean, the Board certainly was well aware that there was a concurrent litigation going on. You know, it understands it needs to be working with special dispatch. I mean, it took about as long as it takes for a regular inter-parties review itself to be completed or to handle a free hearing request. It doesn't make any sense. Well, I haven't looked at the underlying merits of this case. I understand it is a complicated case. There might have been different views within the Board panel itself. There is no absolute deadline. I'm sure the Board did its best to get the decision issued in a timely manner. I can convey your concerns to Board management, but I don't have much standing here to say, standing here before you today to say, to explain what happened. So unlike IPRs where there are certain timelines that the PTO is required to comply with for completion, are you telling me there is absolutely no timeline placed on re-hearing decisions? There's no statutory timeline. Or regulatory? I believe the trial practice... No, is there a regulatory timeline? I don't believe there's a regulatory timeline. Wouldn't that seem to significantly undermine Congress's goal to have an expeditious and fully resolved IPR proceeding within the PTO to avoid unnecessary duplicative district court litigation? I think it potentially can. Like in this case? Don't you think it did in this case? This case is extremely unusual for many reasons. No, do you think it did in this case? In this case, it would have been better if they had issued it sooner and we could have gotten to the invalidity arguments before this court sooner. And it would have avoided a lot of unnecessary litigation and briefing, right? I believe that's correct. And how long did it take for the Board to resolve the entire underlying IPR in this case? There were issues in this case involving joiner of multiple parties. This is a very complex case arising out of a Hatch-Waxman dispute. In the joiner situation, the deadlines also are off. So again, it took longer than usual. That's why this is a very unusual case for resolving or even for evaluating. What made the re-hearing request so unusual? The opinion certainly doesn't give any indication that anybody was struggling with anything. I only know from the fact that it took a long time. Do you know how long it normally takes for panels? Are you aware within the agency of how long it normally takes for panels to deal with re-hearing requests? I believe normally it takes in the time frame of the aspirational two months. Re-hearing requests often are just a check on the Board to make sure that they didn't overlook something or misapprehend the law. And they can normally get them done in a timely manner. I don't know what happened in this case. Is it your sense that 10 months is an outlier for the Board? That would be my... I'm trying to understand how meaningful is this so-called aspirational goal to respond to a re-hearing request in one month or two months. I'm not aware of statistics on the time to re-hearing, so I'd rather not speculate on that. But my basic belief in seeing re-hearing requests is that they're done reasonably promptly. I share Judge Chen's concern, which when a panel is aware of a concurrent district court ongoing litigation, why they wouldn't promptly turn to that particular re-hearing request? Not all IPRs and re-hearings have concurrent district court litigation. But here there was one that the panel board was clearly aware of. Your Honor, it seems like a fair point, and I will take it back to Board management. Okay, is there something you'd like to address? Because your time ran out, but I'm going to give you a chance to address something if you'd like to say something. I'm here at the Court's invitation. I heard several... Now you know why. In the future, you might want to think twice about accepting those invitations. Well, I was very interested in the issues that we were asked to respond to, and I'm happy to respond to those. I'm not going to presume to tell the Court how to deal with the avoidance doctrines. I understand the exchange that you had with Mr. Trella before me. But we do think the estoppel provisions are important. There is some uncertainty about them. The bar at large, patentees, petitioners could benefit from getting this Court's views on estoppel. And I guess I'll say just in broad terms, I'm not sure how far we'll go with this, but the plain language is very clear on both of the issues, the two primary issues we addressed, the successful petitioner issue and the final written decision issue. And the arguments on the other side are almost all policy arguments. And those are, I would say, really are all policy arguments. And those arguments really should be addressed. Do you think those policy arguments make sense? Do you think this is a common-sense outcome, what you're advocating for in terms of your conception of the statute? Yes, ours is a very common-sense outcome. The outcome here to block the defendants from persisting with its very same invalidity argument that prevailed on in front of the four, three different ways? It's perfectly consistent with Congress's intent to avoid duplicative litigation once there is. But now the petitioners have been deprived of their ability to pursue a position that they actually prevailed on. It's not that they lost, but they won. So to me, you say it's common sense, but to me, I would think common sense goes the other way. So can you explain to me why it's common sense to deprive and take away from the defendant a position that they prevailed on in another tribunal? It has to do with the very fact that there are two tribunals at issue here. The petitioner here chose to get the faster, less expensive, more expert tribunal, the QTAB. Yeah, look where that got them in New York. Yeah, the petitioner was successful, and in the normal case. Again, to extend out the logic of the current fact pattern, they would be enjoined from commercially marketing their product under your understanding of the statute. But not at all. As Your Honor suggested, the district court could very easily have issued a state in this case and any other case where this might arise, and that probably is the best result. Those are the policy arguments should be addressed. If the petitioner thinks there's a bad result here, they can explain that to the district court. The district court more than likely would issue a stay. The other place a petitioner can go if they have a problem with this, and I think it may only occur in Hatch-Waxman and shouldn't even occur there, would be to go to Congress, which is equipped to deal with the balance between. I know. I felt like this case was a bit of the perfect storm in my mind. And what I mean by that is I don't see how this situation presents itself hardly ever because I feel like most district courts would issue stays in circumstances like this, which moots this issue. I also feel like the PTO usually acts quite expeditiously, and there aren't – I mean, how many petitions for rehearing are generally filed within the PTO other than for simply delay tactics potentially? You can't speculate on whether they're for delay tactics. How many rehearing petitions are filed within the PTO? I don't have an answer to that. I think there is a standard that must be met. They have to make an argument that the panel actually overlooked something or misapprehended some point of the law. You don't have any sense? You can't tell me in your experience less than half or less than 20 percent or – I'll tell you right now, rehearing petitions in the federal circuit, every case, every single one. Okay. So what's your sense? I'd guess in the range of half, I think, but it's a guess. I'd have to check with the board. I'm trying to wrap my brain around Mr. Trella's argument that there's a real problem here and that we need to reach this statutory interpretation issue. Otherwise, there's going to be real impact on real people out there. And I was suspicious of the correctness of those assertions, both because the district court could easily grant a stay, which would obviate this problem in its entirety and probably should have, And of course, the refusal to grant a stay in that case could have even been nameless to us, right? And so we could do something if necessary, as we have in the past in circumstances like that. But in any event, a stay was a very real possibility. And the other thing is I just don't see how often it's going to be the case that the PTO drags its feet as long as it did in this particular set of circumstances such that we end up in the situation that we're in. Because normally, these IPRs move a lot quicker. And so what I was trying to gauge from you is the only open-ended avenue that I was aware of was rehearing, where there's no actual time limit. And so I'm trying to gauge, get a sense of how real is this problem that Mr. Trella has in this case. I agree with you that it's not very real, because even if there have been delays in rehearing decisions, this issue has not presented itself before. We haven't encountered it before in this case. The AIA has been in place for six or seven years now. So I don't think it's a common problem. I do think litigants, especially on the Hatch-Waxman side, and the filers could benefit from understanding what the rule is. You know, if the rule is as we say, that might be a motivation for them to file their and-as a little bit earlier. But again, that may well be beyond the scope of what this Court needs to rule on here. To file their and-as a bit earlier or to file their IPRs a bit earlier? I'm sorry, that's what I meant. File the IPRs a little bit as soon as possible so as to get the result contemporaneously with the litigation. Okay. Thank you, Mr. Cross. I'll turn it to Mr. Kelly. May it please the Court. Good morning, Your Honors. As the Court is aware from the discussions today, we've all seen there's a lot of different ways that this case can be resolved, and I'm happy that Mr. Trello can see it. Just a quick question. Did your side file a motion to stay the district court action once the IPR decisions came out last January 2018? No, Your Honor. Neither side filed such a motion. Okay. How come? I would think it would have been the right instinct for your side to try to stay the district court action and then let the IPRs play themselves out through rehearing and then federal circuit appeal. Well, Your Honor, the motion in Limine was raised early and resolved early by the district court during the hearing, actually, I believe. And so it was not in our interest to stay that case because we actually wanted to get to a resolution of that case because we have a very, very strong invalidity case. We wanted to get to the issue. As to whether or not a stay would have theoretically worked for either side, I'm not sure it would have in this case because at the time it came up in the district court, the Hatch-Waxman 30-month stay was in existence at that point. And the 30-month stay can be adjusted, either lengthened or shortened, based on the parties' activities in the case. So if one side wants to slow down the case, the district court can theoretically extend the 30-month stay. And if the other side wants to do something the other way, the district court can theoretically slow down the 30-month stay. So you have the background issue of the 30-month stay in effect at the time this was happening at the district court. If that 30-month stay expired right about the time the district court issued its decision in this case, I think in October of 2018. So, okay, so you saw a risk that the 30-month stay might get extended out to, I don't know, a 40-month stay. No, Your Honor, I didn't mean to suggest that we didn't do it because we saw a risk. We liked what was happening in the district court. I suppose we could have asked for a stay, but we had a very strong case. We realized that by raising this issue in the district court, we were putting ourselves at risk a little bit. They could have theoretically won at the district court. And if they won on the invalidity issue at the district court, there would be a stay in place right now, and that stay would last as long as they can slow down the PTAB cases, which they've already proven their ability to do quite well. And so what we wanted to do is get to the end of the case so that we could go on to the market. What was your expectation based on past experience on the amount of time re-hearing would take? I have no idea why this re-hearing decision took this long. I'm aware of re-hearing decisions taking, in fact, much longer than this. On remand, I've heard of cases extending a long time, but I trust that this is an outlier, and I believe it to be an outlier. But that doesn't mean that we should just trust that there won't be an outlier in the next case. And incidentally, as to the amount of re-hearing requests, my sense is that it's well below 50%, not that it's that big. It's like Solicitor Day at the PTO. I just realized we've got three of you involved in this, one on each side and one on the bench. I apologize for that. We've got to get it right, right? We've got three solicitors weighing in. And at least two of us disagree. At least two of us. So before, I want to just address one issue quickly before I let it slip away. Mr. Trella referred to the secondary considerations, and this is, as far as I can tell, the only argument as to how a different claim construction could possibly matter to the DTAB cases, because we know it can't matter because we have the WACCART ICR, where the board specifically made findings about the teachings of SART 4. Unless he's right, which I'm hoping he'll maybe readdress on rebuttal, unless he's right that there was some impact on the secondary consideration evidence. I mean, that would be the only thing. Yeah, I will tell you, I read the WACCART exactly that way. I turned him right to the pages of it. I read it as creating an independent basis for affirming this IPR decision, regardless of claim construction. But in his response to me, it was not so much that I was wrong in how I read it. It was more that, yes, but if they're still right about claim construction, he believes that the secondary consideration determinations were impacted by claim construction. Right, so I understood that to be his argument today as well, which is that if the claim construction is somehow constricted or narrowed beyond what the board found, that they need to do over on- No, if the claim construction is not what he's arguing today, it should be. Right, I guess that's what I meant to say. The board construed the claims under BRI to a certain extent, and they are now arguing that it needs to be narrower, that treating needs to be anti-cancer treating only, and that because it's narrower, that affects the case, and we know it doesn't affect the principal case because we have the WACR at IPR. Okay, so when we get into secondary considerations, the question is, does the anti-cancer treatment requirement that they want to write into that claim, does it affect the secondary considerations to the extent that we need to do over? And what he pointed you to today, and what I'd like to address just really quickly, is the language at the top of page 370. And this is the sentence that actually begins on 369. The board says, this literature's discussion- Give us a second. Oh, I'm sorry. Give us a second. I'm sorry. Okay, go ahead. So at the bottom of 369, the board writes, this literature's discussion acknowledges the previously known roles of abiraterone acetate and prednisone, and the discussion of a corticosteroid generally contradicts the specific anti-cancer role of prednisone argued by patent owner. So what that shows us is that the board was not just thinking about this anti-cancer alternative in the principal part of the 103, but had still had it on its mind when it got into the secondary considerations. So the very sentence he pointed us to demonstrates that the board was actually thinking about the anti-cancer notion of prednisone that they're arguing. Can you translate what this statement means? The discussion of the corticosteroid generally contradicts the specific anti-cancer role of prednisone argued by the patent owner? Sure. I mean, yes, it acknowledges the patent owner's argument of the anti-cancer role of prednisone, but I don't quite- Can you explain what the sentence- I think what they're getting at there is that Janssen had made an argument about commercial success, that because we have commercial success, this defeats the logic behind the obviousness case, like the standard commercial success approach, and there's two answers to that. The first is the blocking pattern, which is actually the more powerful answer, but the second answer is that what they attribute the success to is defeated by the fact that the prior art, if there was success, already understood the need for a glucocorticoid-like prednisone in this treatment method, and because the prior art already understood that, that any success that they had might have been coming from that use of prednisone. Understood that from Sartor, or understood that just generally to reduce side effects? Understood that from evidence other than Sartor, because Sartor teaches us about the anti-cancer effects. And so what the board is saying here is, look, even if you have commercial success, it's not clear that the commercial success is from the anti-cancer effects, which you are now arguing, but in fact it's from the known palliative effects that the prior art talked about in a lot of different ways. That's my understanding of what the board is saying here, which is just another piece of evidence that the secondary consideration issues, just like the main 103 issue, does not need a remand, even if this court should disagree with the board's claim construction. But it also goes back to the meaning of treatment. It does, Your Honor, and so I'd like to address that right now, I guess, because Judge Chen, you raised this morning the issue about an anti-cancer agent or an antibiotic. Or a steroid. Or a steroid, and that's exactly how the board looked at this case. The board said, well, it's clearly not directed to the second agent being an anti-cancer agent. It presents it in the alternative. But there's another rationale that we can rely on, and that's in column four of the patent. In column four of the patent, it discusses the need, what refractory cancer means. And it says refractory cancer is a cancer that is not responding to an anti-cancer treatment. They specifically, the inventors, specifically narrowed what they meant by treatment in that column of the patent to a particular type of treatment, and that's anti-cancer treatment. And I can point the court directly to that. That's on column four, which is in the record at page 759. And the paragraph that begins at line 23 says, as used herein, and unless otherwise defined, the phrase refractory cancer means cancer that is not responding to an anti-cancer treatment. So when the inventors wanted to talk about a type of treatment that was anti-cancer, they knew how to say it. Just as when they wanted to talk about an ingredient in their drug that was specifically anti-cancer versus a steroid, they knew how to do it. So the board was on very solid ground when they said treating in the 438 patent extends beyond anti-cancer treatment. And so if the court has no more questions on that, I'll just turn to 315E2, which is the court understands that pretty clearly it does not need to be reached in this case. But before we go on the Lockhart IPR, I did see in a couple of places in the blue brief, I guess under the reasonable expectations success section, where they do talk about SARTA and how maybe SARTA isn't clear enough or plain enough in giving one a motivation to add prednisone for some kind of anti-cancer effect. So could you just respond to that? Sure. And I think what they point to is the parts of the brief your Honor is looking at is testimony, perhaps in the declaration, that they think suggests that people skilled in the prior art would not have believed that SARTA or I should say that prednisone has an anti-cancer effect. So what they're doing there is they're pointing to evidence that they say is contradictory. And my response to that would be there may have been evidence that they perceived to be contradictory and it may or may not have been contradictory, but that was all before the board. The board saw the evidence that they pointed to the board and the board saw SARTA and the board made a finding. And the board's finding was that it was recognized in the art that prednisone had an anti-cancer effect. And that finding is supported by substantial evidence and that substantial evidence is SARTA. So the fact that they want to suggest that this court should reweigh the evidence we don't think is persuasive. And at pages 350, 351, and I think all the way to 359, that is the board's discussion of reasonable expectation of success in the Wachhart IPR. And the board doesn't just talk about it at the beginning of that, it talks about it at the end. So throughout that discussion of what one skilled in the art would have expected, the board is alternatively pointing to SARTA as teaching. So even if this court would somehow conclude that the BRI, the broadest reasonable interpretation that the board reached, should somehow have been narrower, notwithstanding what it says pretty clearly in the specification, it still doesn't matter. It still doesn't matter because the one place where they brought it up, and we would say that they've actually waived that issue because of the emergent IPR, the one place they brought it up, the board actually addressed it. Is there any evidence in the record that anyone was actually discouraged by the so-called blocking patent from investigating how to use the Barrett drone? Yes, if the court is asking is there affirmative evidence that someone was dying to conduct these studies and they said, well, you know, we just can't because of this blocking patent, I'm not aware of evidence like that. I think the problem is we have the blocking patent. So we have the exclusive right and we have the fact that no one did it. And so based on the blocking patent and this court's case law about it, that's enough to suggest, well, there was an impediment. You would not have done it. And by the way, there wasn't just a blocking patent, but there's also the approval that they have. The FDA approval? Mm-hmm. And their response to the blocking patent is that they may have tried to license it, but the fact that they could not entice someone to pay whatever they were seeking in their royalty rate to get someone to do the experiment does not overcome the fact that why would someone pursue a treatment alternative that they absolutely couldn't engage in because it's blocked by a patent? We don't have to wrestle with the scope of the claims in that earlier patent and whether it might have blocked or might not have blocked. It was blocking abiraterone. That was the purpose of that patent. So no one could enter the field by combining abiraterone with anything else. I'm just trying to understand the state of the case law. The case law doesn't say that the existence of a blocking patent per se neutralizes commercial success evidence, right? Not necessarily, Your Honor, but I think that where case law has gone, it depends on what is actually blocked and how many patents there are. I would submit that this case is a little bit different because we have one ingredient that we can identify by its chemical structure, and that chemical structure is exactly what's the contents of the exclusive right in the blocking patent. So they just simply can't get there. And whatever evidence that they have about licensing, that is evidence that the district court considered. That's evidence that the board looked at. I'd love to see you turn to 315 if you don't mind. I'd be happy to. So let me start with where the government and Janssen have basically put all their eggs in the basket of saying, this is a venue selection provision. I don't care how they label it. Why is this plain language of this? You may not assert either a civil litigation action arising in Holland Park under 1338. Why? I don't understand. I mean, the language seems really clear. You can't assert any ground the petitioner raised or reasonably could have raised during the IPR. I don't know. That language seems really plain on its face. And, Your Honor, it comes under the heading of estoppel, and we know that other portions of Title 35, or at least one other portion of Title 35, refers to the estoppel that's created by 315E2. So we believe, as we've briefed, that the word estoppel carries with it the meaning of estoppel. And so you have to interpret those words in the overall scheme as to what estoppel is actually being created. I'll keep going. I just want to recognize it. I don't understand. Okay. You just keep saying the word estoppel over and over as though that answers my question. I don't get it. Because, Your Honor, if it's an estoppel provision, you have to consider how it's actually creating the estoppel. Because it's grounded in equity. Right. Well, it's grounded. We bring with it the baggage of estoppel as it's used in the district courts and as it's used in equity and where it has come from. And we also look at how the words that Your Honor is looking at actually emerge in the statute. Emerge in law and equity in these courts. So the consequence, because it's grounded in equity, what you're saying is when the word is used, it must necessarily imply its history. It implies history and also how we should view the rest of the words in that section. And so if I will embrace for a second their understanding of the words in the section and I think the understanding that the court was pointing to and explain why it is that that doesn't actually make any estoppel actually arise. If we lost, if the petitioner lost at the board, the reason the words of 315E2 create estoppel is because of the overlay of the presumption of validity in the district court. If our hands are tied, we turn to the district court, we cannot raise what we just lost at the board over, then we lose at the district court. And the reason we lose at the district court is the presumption of validity kicks in and that patent is invalid. I'm sorry, valid. If you flip it upside down, so if we were to have one at the TTAP as we did, if our hands are tied, that does not create any estoppel. And whatever happens in that case, if they want to say, as the government did, well, it does at the end of the day. At the end of the day, it does. Because at the end of the day, if this court affirms a certificate issues, those claims will essentially evaporate and the co-pending district court case will go away. That happens later. One of the problems that I have with your argument is I'm not sure how it makes sense because you're saying, well, estoppel isn't just, it doesn't apply to all arguments you raise. It only applies to all arguments you raise and lost on, right? That's your argument. No, our argument, Your Honor, respectfully, is that the estoppel of 315E2 doesn't in any logical sense ever apply to anything someone raised or could have raised or anything if they're the winner. It just doesn't apply to them because that's not how estoppel works. There is, when you go into court and you win on an issue, that doesn't create any estoppel for you in a classical sense, in a logical sense, as the government would say, I think, in an intuitive sense. The fact that you won, you're not, if you're just trying to apply it, and we weren't even trying to do that. Mr. Kelly, what if Congress did intend to make it a choice of venue provision? What other words would it have used other than the words that it used? It would have used words that clearly cut off the district court litigation so as to avoid duplicative tribunals, and what they would have done, first of all, is they wouldn't have triggered it by the final written decision. They would have triggered estoppel by the institution decision because the only reason we need to know that there's a final written decision in order to apply estoppel, frankly, is we need to know who won or lost. So if the statute says if the petitioner in IPR of a claim in a patent results in an institution of that IPR request, then that petitioner may not assert any grounded invalidity that this petitioner raised or could have raised during the IPR? Is that, I mean... Something like that. To me, that doesn't really move the ball, whether it replaced the words final written decision under 318A with institution decision. It moves the ball remarkably, Your Honor. It gets it to where they think it is. So what they keep saying is once you choose a path, that's your path, and it cuts off the litigation. That's not how 315E2 works. You have to walk all the way down the path under their theory and get to the end of the path, and then it cuts off the walk that you took on the first path. That doesn't make any sense. So I think what Your Honor said, if I understood it would have worked, is they could have said once an IPR is instituted, a district court shall not consider any invalidity arguments raised in the IPR or could have been raised in the IPR. That would be a venue choice provision. That's not what this says. It says if there's an IPR, and it gets to the very end, and there's a final written decision, then this kicks in. The only thing that we know based on that final written decision is who the winner is and who the loser is. Just like you pointed out that Section E has the header estoppel, and you would like me to insert the word collateral before estoppel even though Congress didn't, and you would like me to believe that Congress embraced the common law of collateral estoppel when they used the word estoppel, even though there are other kinds of estoppel other than collateral estoppel, the section begins at Section 315, and the title of it is called Relation to Other Proceedings or Actions. So if the umbrella of all of Section 315 is delineating between the relationship and articulating the relationship between multiple proceedings, and if Section A2 is all about saying that staying a civil action is a matter of right if the IPR is filed first and everything, why isn't this exactly what they are alleging it is, which is Congress's attempt to delineate when one case should move forward and not the other, or when one should move forward and not the other. Why isn't pretty much most of what's contained within 315, including the title of the whole section and the stay of civil litigation action and everything else, the attempt by Congress to convey quite clearly that they don't want these duplicative litigations going forward. And if that's how I read, not just the language of 315E2, which is how I read the language of 315E2, but even if it weren't how I read it, why take it in context with everything else? Wouldn't I overall look at this provision as one in which Congress was attempting to make clear we don't want these duplicative litigations? Because the statute is more complicated than that. Because there are a number of paragraphs... You want me to look at the word estoppel in E, and you want that to dictate how I understand E2, but you don't want me to read the language in the title of section 315, even though this is section 315E2? You want me to read E and use it to interpret 2 in the way you want, but not 315? No, Your Honor. All of 315 has different provisions in it. And we recognize that estoppel is related to how one proceeding affects another proceeding. We're not saying it's not. But to say that they're all choice of venue provisions ignores the fact that Congress did actually put in choice of venue provisions. Do you agree that A2 is a choice of venue provision? No, Your Honor, I wouldn't agree that A2 is a choice. So what do you think A2 is? A... It says if there's a civil action that was filed after an IPR, civil action shall be automatically stayed. And it gives a number of exceptions, but why isn't that an indication by Congress that its intent was only one to move forward at a time and not both move forward simultaneously?  If it's a civil action triggered and not overcome by any of those other things, then yes, that would be compelling the district court to stop in the PTAB moving forward. And then 315A1, if the DJ action is filed first, that would bar the inter-party review. Those are choice of venue provisions. And then if we skip down to... Do you mean DJ? It says DJ. Yes. Oh, okay. Yes, that's right. That's what that means. An inter-party review may not be instituted before the date. Okay. So then we get down to 315B. 315B is where we get the one-year bar from. So we know that if you are a defendant and you're sued under 315B, you can't move forward after one year. And so those are where Congress is saying this can happen or that can happen. Those are the choice of venue provisions. 315E2 is simply not a choice of venue provision. It's not telling you that the district court, you have to stop. Once we know the PTAB is going to make a decision, there's nothing else for the district court to do. Is there anything else you wanted to address? I understand your arguments on this. Is there anything else that you think we need to hear about before we let Mr. Trella get up and have his rebuttal time? No. Excellent. Thank you. Go ahead, Mr. Trella. We'll give you, like, your whole five minutes of rebuttal time. I hope you don't have to use all of it. I will try not to, Your Honor, but I can't make any promises, I'm afraid. We won't let you run over, though. Well, let me pick up with 315E2 really briefly. A couple of things on that. One is, as I think Your Honor pointed out, the heading that they're relying on, first of all, you only look at headings if there's ambiguity. The law is very clear on that. The heading they're relying on is estoppel, not collateral estoppel, which is the way they want the court to read it. The other thing that they completely ignore is the predecessor statute, which said exactly what they want this one to say, and Congress changed it. Change is presumed to have meaning. The other thing is that the argument – That's like Sutherland on statutory construction. Isn't the legislature also presumed to have common sense? If you cite that, do you have to do it with a Southern accent? Sutherland is from the South, I think. Well, Your Honor, I don't know if there's a presumption about common sense. There is a presumption that the plain language of the statute should be applied, and the plain language here is pretty clear. The other thing is – It says in Sutherland that the legislature is presumed to have a rational purpose. True. And there is a rational purpose here. Once the agency is deciding an issue, courts shouldn't get into it. And that gets to the institution decision point, and I'm not completely sure I followed that, but under 317A, the fact that an institution decision was made doesn't inevitably mean that a final written decision is going to follow. So you need the final written decision, and it's not because you need to know who won. It's because you need to know, is the agency going to decide validity? Now, on the block card alternative claim construction point, first, Judge Moore, to answer your question, our opening brief, pages 37 to 38, reply pages 10 to 11, we do, in fact, address that. And our argument on that is not limited just to objective indicia. It also goes to reasonable expectation of success. The board, although it said that SARTOR, the 1998 SARTOR reference, might have led one of ordinary skill to expect that prednisone would have an anti-cancer effect, the board never found that one of ordinary skill would reasonably expect the combination, that the prednisone in the combination would have an anti-cancer effect along with abiraterone. And, in fact, it could not have made that finding because the petitioners told the board it couldn't make that finding. Just as an example, in the Amerigen petition, and this is at 29.303 of the appendix, it told the board in the 1980s there was a belief that prednisone might be useful for treating prostate cancer, but by 2006 it was known that prednisone was not effective as an anti-cancer agent. They say the same thing at 29.342, and each of the petitioners' experts took the position that one of ordinary skill would not have expected prednisone in the combination in 2006 to have an anti-cancer effect. We cite that in our blue brief at pages 38 to 39, and we quote some of them, but if you look at those references in the appendix, they're very clear on that. There was no expectation of success in achieving these claims with prednisone having an anti-cancer effect. Another thing I wanted to turn to. What about the statement that prednisone alone led to an average decline of 33 percent in PSA responses after initiating prednisone for up to six months? A couple of things with that, and that's, I think, from Sartor, 1998. By 2006, even Sartor himself recognized that prednisone alone did not have anti-cancer efficacy. Also, the standard for looking at PSA had completely changed. Drops of 33 percent were not considered. There wasn't even a reportable response. You needed a response of at least 50 percent of a certain duration before it was even considered evidence of activity, much less efficacy in treating cancer. By the time, and as Amerigen recognized, early on there was this thinking that prednisone might have an anti-cancer effect, but by 2006 that had been completely dissipated, and 2006 is the relevant time. Now, there was also a claim. Do you think that we need to overturn the board's fact-finding related to Sartor reasonably standing for the proposition that administrating a prednisone is tolerated and effective in a subset of cancer patients? No, I don't think you need to overturn that. I think you should, but I don't think you need to. You didn't argue for us to. Well, then I guess you shouldn't. But that's not the finding the board needed. The finding was a reasonable expectation of success in achieving the claimed invention. The claimed invention is the combination with prednisone having anti-cancer effect in the combination. Their experts said that was not the reasonable expectation at the time. Now, on the claim construction issue, Mr. Kelly referred to Column 4 and the reference to anti-cancer treatment, but what he loses sight of is that prednisone is expressly defined to be an anti-cancer agent. So everything he said about this supposed distinction between steroids and anti-cancer agents, whatever it applies to, it does not apply to prednisone, and prednisone plugs in the claims. And I'm out of time, and I'm not going to run over. Well done. I thank all plaintiffs for their argument. It was very helpful for the court today. Thank you, Ron. All done.